UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

IZZO GOLF, INC.,
f/k/a Dancorp Investors, Inc.,

                                      Plaintiff,

            -v-

KING PAR GOLF INCORPORATED
d/b/a KNIGHT GOLF COMPANY,

                                      Defendants.

_____

DECISION AND ORDER

02-CV-6012 CJS

APPEARANCES

For the Plaintiff:                  Paul J. Yesawich, III, Esq.
                                         Neal L. Slifkin, Esq.
                                         Laura W. Smalley, Esq.
                                         Harris Beach LLP
                                         99 Garnsey Road
                                         Pittsford, New York 14534

For the Defendant:                Marshall G. MacFarlane, Esq.
                                         Young & Basile, P.C.
                                         2001 Commonwealth Blvd., Suite 301
                                         Ann Arbor, Michigan 48105

                                         Andrew P. Zappia, Esq.
                                         Nixon Peabody LLP
                                         900 Clinton Square
                                         P.O. Box 31051
                                         Rochester, New York 14603-1051

INTRODUCTION

    This is an action alleging the infringement of a patent for a "dual strap carrying system for golf bags". More specifically, plaintiff Izzo Golf, Inc. ("plaintiff"), the maker of the Izzo strap

system for golf bags, alleges that defendant King Par Golf, Inc. ("defendant"), a competing manufacturer of golf bags, has infringed its patent, U.S. Patent No. 5,042,704 ("the patent"). Now before the Court is the issue of claim construction. The Court's construction of the disputed terms is set forth below.

## BACKGROUND

The subject invention is a carrying-strap system for golf bags. According to the patent, a "typical golf bag" has

> a single strap [which] extends from an upper rim of the golf bag to a mid-point on the bag. The golfer or caddy . . . carries such bag by inserting one arm through the strap so that the strap extends across one shoulder thus supporting the bag for travel . . . . A disadvantage to this system has long been present . . . . [resulting] from the fact that the entire weight of the golf clubs and bag, which may typically be on the order of twenty to twenty-eight pounds, strains the muscles of the neck and shoulders unduly and further causes muscular strain resulting from the imbalanced nature of this method of carriage.

Patent 5,042,704, "Background of the Invention". Plaintiff's invention purportedly corrects this problem by using a dual-strap design to more evenly distribute the weight of the bag across both shoulders of the wearer. Claim 1 of the patent states, in relevant part:

> In a golf bag adapted to receive a set of golf clubs . . . said golf bag being in the form of an elongated tube including a surrounding sidewall, a closed end and an open end whereby the shafts of said golf clubs may be longitudinally inserted into said golf bag through the open end . . . the improvement comprising a strap assembly adapted to permit a person to carry said golf bag on either or both shoulders, said strap assembly including a single strap comprising a first strap portion including a first central pad, a first strap portion first end attached on one end of said first central pad and a first strap portion second end attached on another end of said first central pad whereby said first strap portion has a first strap first end secured to said golf bag at a first location proximate said open end and a first strap portion second end secured to said golf bag at a second location axially spaced from the first location so that said first strap portion defines a first strap portion opening, and including a second strap portion including a second central pad, a second strap portion first end attached on one end of said second central pad and a second strap portion second end attached on another end of said second central pad whereby said second strap portion has a second strap

> portion first end secured to said golf bag proximate the second location and having a second strap portion second end secured to said golf bag at a third location axially spaced from the second location between the second location and said closed end to define a second strap portion opening, said first and second strap portions being sized so that one arm of the person can be inserted through the first strap portion opening and another arm of the person can be inserted through the second strap portion opening whereby said golf bag may be supported by said first strap portion extending across one shoulder of the person and by said second strap portion extending across another shoulder of the person.

Patent No. 5, 042, 704, Claim 1. Claim 8 of the patent states, in relevant part:

> A golf bag . . . comprising: an elongated tubular body having a longitudinal axis and including a surrounding sidewall, a closed end and an open end such that golf clubs may be inserted into said tubular body through said open end; a shoulder strap assembly including first and second shoulder strap elements, said first strap element having a first strap end portion and a first strap element free end opposite said first strap end portion and said second strap element having a second strap element end portion and a second strap element free end opposite said first end portion; first mounting means on said golf bag at a first location, said first mounting means connected to said first strap element free end for securing said first strap free end to said golf bag at the first location; second mounting means on said golf bag at a second location axially spaced from the first location, said second mounting means connected to said first and second strap end portions for securing said end portions to said golf bag at the second location; third mounting means on said golf bag at a third location axially spaced from the second location between the second location and said closed end wherein, said third mounting means secures said second strap element free end to said golf bag at the third location; and said first and second shoulder strap elements sized to form first and second strap openings respectively when secured whereby the person may selectively carry said golf bag across one shoulder with only said first strap element and selectively carry said golf bag with both shoulders in a fully supported state by inserting his/her arms respectively through the first and second strap openings so that said golf bag is suspended from and supported by both shoulders with said golf bag oriented transversely across the back of the person.

Patent No. 5, 042, 704, Claim 8. Finally, Claim 14 states, in relevant part:

> a shoulder strap assembly . . . including first and second strap members, each of said strap members having opposite ends; first and second securing means for securing each of said opposite ends of said first strap member to longitudinally spaced locations on said sidewall . . . and a second location longitudinally spaced from said first location whereby said first strap member

> defines a first strap opening . . . ; and third and fourth securing means for securing each of said opposite ends of said second strap member to longitudinally spaced locations on said sidewall to define a second strap opening that another arm of the person can be inserted through . . . .

Patent No. 5, 042, 704, Claim 14.

The portion of the patent entitled "Summary of the Invention" refers to the strap attachment points as being "axially spaced . . . along an attachment axis". Moreover, the summary description further states, in relevant part:

> The strap assembly described above [which utilizes the carrying handle of a traditional golf bag as the second attachment point] may be employed with existing golf bags having a top mounting element, a handle and a bottom mounting element where the top and bottom mounting elements traditionally secure a unitary carrying strap for such traditional golf bags. However, this strap assembly may also be implemented with a specially constructed golf bag wherein a different structure is utilized for the upper and lower mounts. For example, in the exemplary embodiment of the present invention, a first mount located proximate the open end of the bag is in the form of a first mounting strip extending circumferentially around at least a portion of the tubular body on either side of the attachment axis and a first slide ring slideably received on this first mounting strip so that the mounting ring is movable along the first mounting strip to locations circumferentially on either side of the attachment axis. The bottom mount, at the third location, may include a second mounting strip extending circumferentially around at least a portion of the tubular body on either side of the attachment axis and a second slide ring slideably receive don [sic] the second mounting strip so that it is movable to locations circumferentially on either side of the attachment axis.

Patent, Numbered ¶ 4. The patent's "Detailed Description of the Preferred Embodiment" ("Detailed Description") continues, in relevant part:

> [T]he invention, when used in conjunction with the golf bag, broadly includes a pair of straps which are connected to and oriented longitudinally along a golf bag to define an attachment axis. A first strap has a first strap first end connected to an upper portion of the golf bag and a first strap second end connected to the mid-portion of the golf bag that is longitudinally spaced from the upper. The second strap has a second strap first end that is connected to the mid-portion of the golf bag at or proximate to the location of the attachment point of the first strap second end. The second strap has a second strap second end that is connected to a lower portion of the golf bag longitudinally spaced from the mid-portion.

> \*\*\*
> Thus, . . . the first, second and third locations define a longitudinal attachment axis A.

Patent, Numbered ¶ ¶ 5, 6.  The Detailed Description further states:

> A first circumferential mounting strap 60 has end portions 62 and 64 secured [sic] at opposite diametric locations on upper end portion 34 of golf bag. . . . Alternately, mounting strap 60 could extend completely around shell 36 to cradle golf bag 12. . . .  Turning to FIG. 4, it may be seen that the second end 58 of second strap 16 is mounted to golf bag 12 by means of a second circumferential mounting strap 80 which extends completely around to cradle golf bag 12.
> \*\*\*
> The essential feature of the present invention, therefore, should be understood to be the inclusion of a pair of shoulder straps on golf bag with these shoulder straps being sized to accommodate both shoulders of the wearer and being connected so that they each extend longitudinally of the golf bag in end to end relation.

Patent, Numbered ¶ ¶ 6, 12.

The patent specification contains drawings showing the strap attachment points located along a straight imaginary line or axis on the sidewall of the golf bag. *See, e.g.*, Patent, Fig. 2, attachment axis "A".  However, the same drawing shows the strap ends, at the first and third locations, attached by a "D" ring to a strap [referred to below as a "mounting strip"] running circumferentially around part of the golf bag, thereby permitting the strap ends to move circumferentially off the imaginary axis. *See*, Patent, Figs. 2-4.  In other words, in the diagram of the preferred embodiment, the strap ends are not attached to fixed points on the imaginary axis.

With regard to the term "axially spaced", the patent's prosecution history reveals that as originally worded by the inventor, Claim 1 described the second securing location as being "longitudinally spaced from the first location". (Pl. Claim Const. Memo, Ex. H, Application p. 38, line 20)  The patent examiner rejected Claim 1, among other claims, but indicated that the

5

claim would be allowable if, among other things, the inventor changed that wording to read "longitudinally spaced and axially aligned with the first location". (*Id*.; Office Action dated September 28, 1990, p. 6) In response to this suggestion, the inventor instead amended the application to state, in relevant part, that the second securing location was "axially spaced from the first location". (Pl. Claim Const. Memo, Ex. H, Amendment, p. 4, line 11) In requesting reconsideration of the application, the inventor specifically noted this change, stating that he was choosing the term "axially spaced" instead of "axially aligned". (*Id*. pp. 7-8). The inventor further discussed how the term "axially spaced" was intended to differentiate the subject invention's strap placement from the circumferential strap placement found in the *Williams* patent, a prior art patent for a golf-bag carrying system:

> It is submitted that the axial spaced relationship between the strap ends as recited in claim 1, as opposed to the circumferential spacing between the strap ends as disclosed in Williams, involves much more than a mere matter of choice or design. One notable advantage is the ability to carry the bags on either or both shoulders . . . . In Williams, the circumferential extension of the upper strap would make it completely impractical to attempt to carry on one shoulder. Also, the circumferential extension of both straps [in Williams] makes it more difficult and time-consuming in strapping the bag onto both shoulders. . . . Still further, the axial spacing of the straps enables use of the common handle portion of the bag at the intermediate location(s) for the proximate strap ends of the two strap portions.

(*Id*. at 8) The patent examiner acquiesced to the inventor's proposed change. That is, he approved the use of the words "axially spaced" instead of "axially aligned."

Plaintiff commenced the subject action, alleging that defendant is manufacturing and selling golf bags that "incorporat[e] the dual-strap technology of the '704 Patent." (Pl. Claim Construction Brief, p. 1). Counsel for the parties requested that the Court construe certain terms in claims 1, 8, and 14 of the subject patent, pursuant to *Markman v. Westview*

6

*Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384 (1996). The Court scheduled a Claim Construction Hearing for November 30, 2005, at which the Court and counsel agreed that counsel would proceed by way of oral argument. Subsequently, the parties submitted post-hearing briefs. The Court has now reviewed the hearing transcript and the parties' submissions.

## ANALYSIS

Patents have two distinct elements: first, a "specification", which is description of the invention in such terms "as to enable any person skilled in the art to make and use the same"; and second, one or more "claims", which "particularly point out and distinctly claim the subject matter which the applicant regards as his invention." *Markman v. Westview Instruments, Inc.*, 517 U.S. at 372-73, 116 S.Ct. at 1387-88 (citations and internal quotation marks omitted). The claims are "the portion[s] of the patent document that define[ ] the scope of the patentee's rights." *Id.*, 517 U.S. at 372, 116 S.Ct. at 1387. "The claim defines the scope of a patent grant, and functions to forbid not only exact copies of an invention, but products that go to the heart of the invention but avoid the literal language of the claim by making a noncritical change." *Id.*, 517 U.S. at 373-74, 116 S.Ct. 1388 (citations and internal quotation marks omitted). Consequently, "[v]ictory in an infringement suit requires a finding that the patent claim covers the alleged infringer's product or process, which in turn necessitates a determination of what the words in the claim mean." *Id.*, 517 U.S. at 374, 116 S.Ct. 1388 (citations and internal quotation marks omitted). It is well-settled that "the construction of a patent, including terms

of art within its claim[s], is exclusively within the province of the court." *Id*., 517 U.S. at 372, 116 S.Ct. at 1387.[1]

> When a court performs this function of construing patent claims,
>
> > the words of a claim are generally given their ordinary and customary meaning. . . . [T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application. . . . Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citations and internal quotation marks omitted). In fact, the specification is "the primary basis for construing claims." *Id*. at 1315 (citation omitted); *see also, Id.* ("[T]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history.") (citation omitted). As indicated, in addition to the specification, it may also be appropriate to consider the patent's prosecution history, "consist[ing] of the complete record of the proceedings before the PTO [Patent and Trademark Office]", since it "provides evidence of how the PTO and the inventor understood the patent." *Id*. at 1317. Although it is less significant than the patent itself and the prosecution history, courts may also refer to extrinsic evidence, consisting of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id*. When consulting extrinsic evidence, however, a court should be careful not to focus "the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id*. at 1321.

---

[1] *See also, Id.*, 517 U.S. at 384, 116 S.Ct. at 1393 ("The[re are] two elements of a simple patent case, construing the patent and determining whether infringement occurred . . . . The first is a question of law, to be determined by the court, construing the letters-patent, and the description of the invention and specification of claim annexed to them. The second is a question of fact, to be submitted to a jury.")

As discussed earlier, the patent's specification is an important resource when construing claims. However, courts must be careful to avoid reading limitations from the specification into the claim:

> [A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments. To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so. One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide *an example* of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive. The manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent.

*Phillips v. AWH Corp.*, 415 F.3d at 1323 (emphasis added, citations omitted).

On the other hand, the subjective views of the inventor are usually not considered when construing claims:

> No inquiry as to the subjective intent of the applicant . . . is appropriate or even possible in the context of a patent infringement suit. The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history). In fact, commonly the claims are drafted by the inventor's patent solicitor and they may even be drafted by the patent examiner in an examiner's amendment (subject to the approval of the inventor's solicitor). While presumably the inventor has approved any changes to the claim scope that have occurred via amendment during the prosecution process, it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO.

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995), *aff'd* 517 U.S. 370, 116 S.Ct. 1384 (1996); *see also, Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1379 (Fed.Cir. 2000) ("In *Markman*, we addressed the . . . issue of litigation-derived inventor testimony in the context of claim construction, and concluded that such testimony is entitled to little, if any, probative value.").

The parties agree that the references in the patent to "securing means" are "means plus function" language within the meaning of 35 U.S.C. § 112, ¶ 6, which states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

It is well-settled that "[t]he first step in construing such a limitation is to identify the function of the means-plus-function limitation. The next step is to identify the corresponding structure in the written description necessary to perform that function." *Gleason Works v. Oerlikon Geartec AG*, 238 F.Supp.2d 504, 512 (W.D.N.Y. 2002) (citations omitted).

With these principles of law in mind, the Court will now proceed to construe the disputed terms.

<u>Axially Spaced</u>

The most hotly-debated issue of claim construction in this case is the meaning of the term "axially spaced". Defendant contends that the term means "on a single straight line". (Def. Brief at 10). In that regard, defendant maintains that the patent requires that the strap attachment points be fixed on, and not deviate circumferentially from, the axis "A" depicted on

Figure 2 of the patent.[2]  According to defendant, the invention had to have axially-aligned attachment points in order to overcome the prior art of the *Williams* patent, cited in the subject patent, which utilized circumferentially-offset straps.  Plaintiff, however, states that,

> [t]he term 'axially spaced' means that the points are spaced along an axis, but they may also be spaced in other directions – i.e., circumferentially along the side of the cylinder.  Indeed, the term 'axially' simply is a word that modifies the term 'spaced' and means 'located . . . in the direction of an axis.'

(Pl. Brief, at 12) (citing American Heritage Dictionary, at p. 93 (1981)); (Pl. Presentation Materials at 18) (Stating that the term "axially spaced" means "spaced along an axis not in a line on an axis").[3]  According to plaintiff, defendant wants the Court to define "axially spaced" to mean "axially aligned", a definition which the inventor rejected during the prosecution of the patent.

From studying the subject patent as a whole, it appears clear that claims 1 and 8 require the invention's three strap-attachment points to form, and be located along, a straight axis line running from the top of the bag to the bottom of the bag.  Accordingly, the Court gives the term "axially spaced" its ordinary dictionary meaning: "Located on, around, or in the direction of an axis." WEBSTER'S II NEW COLLEGE DICTIONARY 79 (Houghton Mifflin 1995).  An axis is "[a] straight line about which a body or geometric object rotates or may be thought to rotate," or "a center line to which parts of a structure or body may be referred." *Id*.  To the extent that plaintiff is urging the Court to adopt a definition of "axially spaced" that would allow the attachment points to be spread around the outside of the bag circumferentially, i.e. away

---

[2] "We assert that axially spaced locations are in a straight line, positioned on the spine of the bag, and each of those three locations is on that line." (Oral Argument Transcript at 62)

[3] Plaintiff concedes, however, that the term "axially spaced" is more restrictive than the term "longitudinally spaced". (Oral Argument Transcript at 28-29)

11

from the axis line depicted in the patent drawings, without any requirement that they be at least capable of alignment, the Court declines to do so. Otherwise, the term "axial" would be meaningless. Consequently, the term "axially spaced" would not apply to attachment points that are permanently circumferentially offset, such that they are incapable of being axially aligned.[4] However, with the exception of the second or center attachment point[5], the term "axially spaced" does not require that the strap attachment points remain fixed on the axis line. Instead, as it is used in the patent, the term allows for the straps to move circumferentially off the axis, and around the circumference of the bag, during use. To hold otherwise would be to exclude the preferred embodiment of the patent, which envisions the straps moving circumferentially on either side of the attachment axis.

Claim 14 of the patent uses the term "longitudinally spaced" instead of "axially spaced." Defendant maintains that, in the instant patent, the two terms mean "exactly the same thing." (Def. Brief at 14) Plaintiff, however, contends that the term "longitudinally spaced" means "spaced lengthwise or along the long direction." (Pl. Brief at 23) The Court's view is that, since the inventor used the term "longitudinally spaced" in claim 14 , and not in the other claims, where he used the term "axially spaced", the two terms were intended to have different meanings. In fact, as discussed earlier, the inventor expressly changed the terminology from "longitudinally" to "axially" in claims 1 and 8 after they were initially rejected by the patent

---

[4]It appears that plaintiff agrees that the attachment points must at least be capable of being axially aligned. During oral argument, plaintiff's counsel stated: "Our position is that the attachment points can be axially aligned. They run on this – on this longitudinal axis, 1, 2, 3; but they can also move circumferentially . . . ." (Oral Argument Transcript at 26).

[5]It appears that the second of the three attachment points in Claims 1 and 8 must remain fixed on the axis line. There is nothing in the patent to indicate that the second securing means would ever move circumferentially off the axis line.

examiner. Consequently, the Court finds that longitudinally spaced attachment points need only be spaced lengthwise along the golf bag, without regard to being positioned in relation to an axis.[6]

### "End" or "Strap End"

The parties also dispute the meaning of the term "end", as in "strap end." Defendant contends that "the end of a strap portion, member or element is that portion of the strap which terminates at the point of attachment on the golf bag." (Defendant's Opening Brief at 19) Plaintiff, on the other hand, maintains that "'ends' need not be 'ends' of separate straps but can be 'ends' of portions or members of a single strap. (Plaintiff's Responding Brief at 8). For example, plaintiff notes that claims 1 and 8 refer to at least 4 "ends," even though these are actually just points on a single strap. Plaintiff further states that strap "ends" need not "terminate" at an attachment location. For example, plaintiff notes that, as set forth in the patent, the "ends" of two separate sections of strap may actually form a unitary strip that passes through a "D" ring or other securing means.

The Court finds that the term "end" is used different ways at different times within the patent. For example, in claims 1 and 8, where the entire strap apparatus is comprised of a single strap divided into two main sections, the "ends" are the four portions of strap on either side of the two strap pads. Thus, while it is true, as defendant contends, that an "end" is the point at which a designated portion of strap may be said to "terminate", this does not necessarily mean that the strap physically ends there. Rather, the term "end" also refers to the point where one designated section of strap ends and another begins. Moreover, a strap end

---

[6] *See*, Oral Argument Transcript at pp. 28-29.

need not be "affixed directly" to the golf bag itself as defendant suggests (Def. Brief at 19), but may, instead, be the point where the particular section of strap passes through or is attached to the securing means, such as a strap or ring, which is in turn attached directly to the golf bag.

### "Securing Means"

Plaintiff contends that a securing means is "any means used to secure a strap to a golf bag disclosed in the specification, i.e., rings, clips, straps, and any equivalents thereof." (Pl. Brief at 19)  Defendant, on the other hand, states that "D" rings and the handle of the golf bag are the only securing structures disclosed in the patent. (Def. Brief at 22)  However, the Court finds that the specification refers to securing structures such as rings, clips, and webbing strips. Consequently, the Court agrees with plaintiff's offered definition, and finds that securing means is "any means used to secure a strap to a golf bag disclosed in the specification, i.e., rings, clips, straps, and any equivalents thereof."

### "Secured to Said Golf Bag"

The parties dispute the meaning of this phrase, although the nature of disagreement was not originally clear from their submissions.  However, counsel clarified their respective positions during oral argument. (*See*, Oral Argument Transcript at pp. 34-39, 68-72).  In that regard, plaintiff's counsel contends that the term "secured to said golf bag" means that the strap may be secured to the bag indirectly, via a securing means, such as a strap or loop. Plaintiff distinguishes this from the terminology used in Claim 14, referring to attachment points on the "sidewall" of the golf bag, which according to plaintiff, means to be secured directly to the sidewall of the golf bag.  Defendant's counsel, on the other hand, does not appear concerned with the golf bag/sidewall distinction. (Oral Argument Transcript at 68-72)  Rather, he emphasizes that "attached to said golf bag" means that the attachment point must actually

be the point where a strap or section of strap attaches to the bag's outer surface, by some securing means:

> [W]e look for a point on the golf bag . . . where the strap ends are secured to the golf bag. I am saying we find those locations . . . attached to the wall of the bag. We don't find it in the middle of the strap and say, oh-ho, if you follow th strap far enough, it's attached to the golf bag. The points of attachment mean points of attachment; it does not mean attachment in the larger sense.

(Oral Argument Transcript at pp. 70-71) Consequently, the parties' expressed concerns regarding the term "attached to said golf bag" do not really appear to be in conflict. In any event, the Court finds that the term "secured to said golf bag" means that a strap end is attached to the outer surface of the golf bag by a securing means. The point at which the strap is "secured to said golf bag" is the point at which a particular section of strap ends at the securing means.

"Strap Opening"

Finally, while the parties also dispute this term, the patent is straightforward. A strap opening is an opening for the arm of a user, formed by a section of strap as it extends from one securing point to another. There are two strap openings as part of the subject invention, one formed by the first strap section, and one formed by the second strap section.

CONCLUSION

For the foregoing reasons, I construe the disputed terms of the subject patent as set forth above.

Dated:  July 26, 2006
        Rochester, New York                ENTER:


                                           /s/ Charles J. Siragusa
                                           CHARLES J. SIRAGUSA
                                           United States District Judge

15