_____

IZZO GOLF INC.,
f/k/a DANCORP INVESTORS, INC.,

                    Plaintiff

-vs-

KING PAR GOLF INCORPORATED,
Doing business as Knight Golf
Company,
                    Defendant

_____

CORRECTED[1]
DECISION AND
ORDER

02-CV-6012 CJS

## INTRODUCTION

Now before the Court are the following applications: 1) a motion by Izzo Golf for attorney fees (Docket No. [#176]); 2) a motion by Izzo Golf for enhanced damages and pre-judgment interest and post-judgment interest (Docket No. [#182]); and 3) a motion by William J. Baird ("Baird") to intervene in this action (Docket No. [#196]).   Baird's motion to intervene is denied and Izzo's applications are granted as set forth below.

## BACKGROUND

The reader is presumed to be familiar with the underlying facts of this action and the related action, *Izzo Golf Inc. v. King Par Corp, et al.*, 10-CV-6507 CJS ("the companion case"), as set forth in prior decisions of the Court including Docket

_____

[1]  The only change to this Decision and Order involves a correction of former footnote 36, now footnote 37, which previously inaccurately suggested that the Court was not awarding treble damages. The Court is awarding treble damages.

Numbers [#107] and [#195] in this action, and Docket Numbers [#38] and [#59] in the companion case.

Very briefly, Izzo and King Par were competing manufacturers of golf equipment. On January 8, 2002, Izzo commenced this action alleging that King Par was infringing Izzo's patent for a golf-bag strap system, U.S. Patent No. 5,042,704 ("the '704 Patent"). The Court eventually granted partial summary judgment to Izzo as to liability, finding that King Par's "old style" bag infringed the '704 patent. Between June 14, 2010 and June 18, 2010, this Court presided over a jury trial on the issue of damages.

At trial, Izzo introduced evidence showing the following: As of 1997, King Par was a golf company with annual gross receipts of approximately $70 million. At that time, King Par was selling a large volume of golf bags to various national retail- and sporting-goods chains. King Par was not selling golf bags utilizing a dual-strap system, but was preparing to do so, as that design was becoming increasingly popular with golfers. King Par was aware of Izzo's patented dual-strap system and had some discussions with Izzo about obtaining a license, after which Izzo prepared a draft license agreement that would have required King Par to pay Izzo $2.75 per bag. However, King Par's patent attorney advised that it might be unnecessary to obtain such a license, since King Par could "design around" the Izzo patent. In particular, the attorney essentially indicated that the key feature of Izzo's '704 Patent was that the strap attachment points were spaced axially along the golf bag. The attorney opined that King Par could "design around" this by utilizing a dual-strap system in which the strap attachment points

were "circumferentially spaced rather than axially spaced" along the side of the golf bag. The attorney indicated, however, that if King Par chose to attempt to "design around" the Izzo patent, it should first submit the new design to him to review.[2] King Par, though, began producing and selling bags utilizing a dual-strap system in which the strap attachment points were axially spaced, without first showing the design to the patent attorney.

In January 2002, Izzo notified King Par that its "junior bag" infringed the '704 Patent. However, King Par continued to manufacture the infringing bag, possibly until 2005.[3] In that regard, the number of infringing bags sold by King Par, and the dates of their sale, are unclear, because King Par claims that it failed to keep records, and because the figures that King Par provided to Izzo during the lawsuit changed repeatedly. However, it appears that between 2000 and 2002 alone, King Par sold at least 185,274 infringing golf bags. Izzo further estimates that King Par likely sold approximately 113,933 infringing bags in 2003.[4]

King Par, on the other hand, attempted to demonstrate at trial that it did not intentionally infringe the Izzo patent, and that it immediately stopped producing the infringing design after being accused of infringement by Izzo in early 2002. In

---

[2] During his closing argument, Izzo's attorney paraphrased the attorney's 1997 letter to King Par as follows: "Mr. MacFarlane, who is a competent patent lawyer, writes this letter, and, basically, the substance of this letter is you better do one of two things, Mr. Baird: You better either take a license to the Izzo patent if you want to make the design that you're contemplating or design around it. And he tells Mr. Baird, if you're going to design around it, give me the new designs.") (Docket No. [#180] at p. 94).

[3] Describing the evidence adduced at trial, Izzo's attorney stated during closing argument, "It's in catalogs all the way through 2003. It's in sales presentations through 2005." Docket No. [#180] at p. 96.

[4] See, Docket No. [#180] at p. 102; see also, id. at p. 98 ("Now 2004/2005, again, we don't have any understanding of what the volume was or what the volume of infringing bags was.").

that regard, King Par insisted that in or about 1997, it followed its attorney's advice and "designed around" the Izzo patent by utilizing a dual-strap design in which the strap attachment points were not axially spaced, even though this Court later found otherwise.[5]  In that regard, King Par maintained that the design it used was a licensed version of a different patented strap system (the Steurer patent) that it found preferable to the Izzo design.  King Par attempted to show that that it did not begin producing the infringing bag until 2001, and that it stopped selling the infringing bag in the first quarter of 2002.[6]  King Par admitted that the sales figures that it had provided to Izzo during the litigation had repeatedly been shown to be inaccurate, but attributed that fact to innocent mistakes, and to technical problems with the company's accounting system. In sum, King Par asked the jury to find that it only infringed during 2001 and part of 2002; that in 2001 it sold 88,567 infringing bags for which a reasonable royalty was $1.55 per bag; that in 2002 it sold 19,252 infringing bags for which a reasonable royalty was $ .50 per bag; and that the total damages were therefore $146,904.85.[7]

On June 18, 2010, the jury returned a verdict against King Par in the amount

---

[5]  In his closing argument, King Par's attorney stated: "King Par's old style design goes from here off the center line, stays off the center line, and then returns to the center line and there is no effort to attach the strap to the hand grip. So, what King Par did is it copied another design, the Steurer design, and for that it paid a license." Trial Transcript, Docket No. [#180] at p. 86; *see also*, diagram, "King Par's 'Old Style' Dual Strap Golf Bags, Docket No. [#183-2] at p. 16.
[6]  *See, e.g.*, closing argument of King Par, Docket No. [#180] at p. 87 ("Now, there is no question that King Par's old style bag was sold between 2001 and 2002 and it was infringing. We accept Judge Telesca's decision on that point. We owe a royalty on this bag. We owe a reasonable royalty.").
[7]  King Par's closing argument, Docket No. [#180] at p. 81 ("If you do the arithmetic, the total damages to which the Plaintiff is entitled to, according to Mr. Hauswirth, is $137,278.85 for 2001; and $9626 for 2002. It's that simple.").

of $3,286,476.65, for the period January 2000 through 2005.[8]   The jury further specifically found that the infringement was willful.   In that regard, the Court had instructed the jury that to find willful infringement, Izzo would have to prove willfulness by clear and convincing evidence under the rigorous *Seagate* standard in effect at that time, which was later overruled in *Halo Elec. Inc. v. Pulse Elec., Inc.*, 136 S.Ct. 1923 (2016).[9]   In other words, the jury found that Izzo had proven willful infringement under a much higher standard than what is now required.[10] Among the reasonable inferences to be drawn from the verdict is that the jury believed the following facts to be true: King Par was aware of the Izzo patent; the infringement was not innocent; King Par was not truthful concerning the number of infringing bags that it sold; and King Par did not stop selling infringing bags in the first quarter of 2002 as it claimed.[11]

---

[8]  The verdict was significantly higher than the figure at which either party had valued the case prior to trial. Specifically, shortly before trial King Par estimated that its worst-case scenario would be a verdict in the range of $600,000.00, while Izzo had indicated that it would consider settling the case for $1 million. *See,* Decision and Order [#59] in companion case at pp. 3 & 5 (discussing the parties' valuations of the case prior to trial).

[9]  See, Docket No. [#180] at p. 127 ("In order for Izzo to prevail on its claim of willful infringement, Izzo must prove each of the following three elements by clear and convincing evidence. First, King Par was aware of Izzo's patent; second, King Par acted despite an objectively high likelihood that its actions infringed a valid patent; and third, this objectively high likelihood of infringement was either known or so obvious that it should have been known to King Par. In making the determination as to willfulness, you
must consider the totality of circumstances. The totality of circumstances comprises a number of factors, which include, but are not limited to whether King Par intentionally copied the claimed invention or product covered by Izzo's patent and whether King Par relied on competent legal advice.").

[10]  Because of this, and as will be discussed below, willful misconduct is established, though such fact does not necessarily warrant the imposition of enhanced damages. *See, Innovention Toys, LLC v. MGA Entm't, Inc.*, 667 F. App'x 992, 994 (Fed. Cir. 2016) (Indicating that a jury's finding of willful infringement under the pre-*Halo Seagate* standard "suffices to establish the subjectively willful misconduct that, when present, moves the enhancement inquiry to the stage at which the district court exercises its discretion.").

[11]  *See, WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) ("We do not interpret

Immediately following the jury verdict and the Court's entry of judgment in the amount determined by the jury, Plaintiff Izzo filed the subject motion [#176] for attorney fees and expenses, and the subject motion [#182] for enhanced damages and pre- and post-judgment interest.   King Par filed a motion for a new trial.

On September 7, 2010, Izzo commenced the companion case (10-CV-6507 CJS) against King Par's owner, Mr. Baird, seeking, *inter alia*, a declaration that Baird is the alter ego of King Par.   Izzo's position was that while the patent litigation was pending, Baird had committed fraud against Izzo by selling King Par's assets and leaving only a judgment-proof corporate shell.   In that regard, Izzo established that just prior to the patent infringement trial, Baird sold King Par's assets and deposited the proceeds into his personal bank account, without notifying anyone, including Izzo, this Court or his own attorney.   Baird eventually notified Izzo of the sale prior to the patent infringement trial, and attempted to use the fact of the sale (and Izzo's resulting uncertainty as to whether it would be able to collect on any judgment) as leverage during settlement negotiations.   In sum, Izzo sought to establish that Baird was King Par's alter ego based on Baird's complete disregard for corporate formalities in connection with the sale of King Par's assets and the disposition of the sales proceeds.

Baird responded to Izzo's filing of the companion case by instantly placing

---

*Halo* as changing the established law that the factual components of the willfulness question should be resolved by the jury."); *but see, id.* at n. 13 ("Of course, this is not to say that a jury verdict of willful infringement ought to result in enhanced damages. Whether the conduct is sufficiently egregious as to warrant enhancement and the amount of the enhancement that is appropriate are committed to the sound discretion of the district court.").

King Par in Chapter 7 bankruptcy. Baird now regrets that decision,[12] because during the bankruptcy proceeding King Par's rights to defend or appeal the patent infringement action -which were part of the bankruptcy estate- were sold to a third-party company with connections to Izzo.[13] The result was that King Par lost the legal right to appeal the verdict or to challenge Izzo's post-trial motions. Further, Bankruptcy Court found that Baird's receipt of the proceeds from the sale of King Par's assets had been constructively fraudulent, and Baird eventually settled with Bankruptcy Trustee,[14] which resulted in Izzo receiving almost the entire amount of the jury award from the bankruptcy estate.[15]

On or about August 10, 2017, prior to any determination in the companion case concerning Baird's alter-ego status, the party which had purchased King Par's rights to defend this action from the Bankruptcy Trustee withdrew all opposition to Izzo's post-trial motions, leaving them unopposed. Baird responded by filing the subject motion [#196] to intervene in this action, in an attempt to accomplish what King Par could no longer do. Baird essentially contended that the Court should permit him to intervene, since he faced *potential* liability for the

---

[12] *See*, Baird Reply [#200] at p. 4 ("King Par filed for Chapter 7 protection after negligent advice of counsel. . . . King Par never intended to give all of its litigation and accounts receivable collections control to the Chapter 7 Trustee.").

[13] Contrary to what Baird now insinuates, neither the third-party-purchaser nor Izzo did anything improper in that regard.

[14] *See, In re: B & P Baird Holdings, Inc.*, 2015 WL 6152959 at *1 (Bankruptcy Court W.D. Mich. Oct. 15, 2015) (""[F]ollowing the decision of [the Bankruptcy Court] avoiding the payments at issue here as constructively fraudulent, [Baird] paid $3.775 million to the Trustee for distribution to creditors.").

[15] *See*, Decision and Order [#38] in companion case at p. 9 ("After Bankruptcy Court's ruling on this point (that the transfer of Old King Par's sale proceeds to the Bairds' personal bank account was constructively fraudulent), the Bairds settled with the Bankruptcy Trustee, resulting in payments to Izzo in the approximate amount of $3.17 million.").

patent infringement (*if* he were found to be King Par's alter ego) and King Par had no ability to oppose Izzo's post-trial motions or to appeal the verdict. Alternatively, Baird contended that he should be permitted to file *amicus* papers in opposition to Izzo's motions.

Subsequently, on June 6, 2018, while Izzo's post-trial motions and Baird's motion to intervene remained pending in this action, the Court determined in the companion case that Baird *is* the alter ego of King Par. In that regard, the Court found that

> defendant William Baird is Old King Par's alter ego, for purposes of the companion patent infringement action. As requested by Izzo, the Court finds that Baird "is liable for the full amount of damages [including interest, enhanced damages and attorney fees, as may be determined by the Court,] for [Old King Par's/B&P Baird Holdings, Inc's] infringement of U.S. Patent No. 5,042,704 belonging to Plaintiff Izzo Golf Inc., as adjudged in the action styled *Izzo Golf Inc. v. King Par Golf Inc.*, No. 6:02-CV-6012 (W.D.N.Y.)." Although Baird has contended that his liability should be limited to the amount of asset-sale proceeds that he took from Old King Par, he has provided no legal authority for that claim. Moreover, as noted earlier, Michigan law indicates that once the corporate veil is pierced, the alter-ego shareholder stands in the shoes of the corporation.

Decision and Order [#59] in Companion Case, 10-CV-6507.

Thereafter, the Court held off deciding the pending motions in this action (Izzo's post-trial motions and Baird's motion to intervene) to give the parties a chance to explore settlement.[16] However, on October 16, 2018, the court-appointed mediator indicated that the matter had not settled.[17] Accordingly, the

---

[16] *See*, Docket No. [#204] & Companion Case, Docket No. [#61].
[17] *See*, Companion Case, Docket No. [#64].

Court now rules upon Izzo's post-trial motions and Baird's motion to intervene.

## ANALYSIS

### Motion to Intervene Under Fed. R. Civ. P. 24

Baird has moved to intervene in this action, by right or by permission, and has alternatively requested leave to submit *amicus* filings in opposition to Izzo's post-trial motions. The legal standard applicable to motions to intervene is well settled:

> To intervene as of right under Federal Rule of Civil Procedure 24(a)(2), "an applicant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996) (emphasis added). Federal Rule of Civil Procedure 24(b)(1)(B) provides that "[o]n timely motion, the court may permit anyone to intervene who ... has a claim or defense that shares with the main action a common question of law or fact."

*Griffin v. Sheeran*, No. 18-1862-cv, 767 F.App'x 129, 132 (2d Cir. Apr. 16, 2019).

Baird's motion to intervene is denied because he has no legal interest in defending this action that is separate from the right that King Par already gave up. In the bankruptcy action, King Par lost the right to defend this action. [18]   The sale of this right by the Bankruptcy Trustee is undisputed.[19]   The entity that legitimately

---

[18]  *See Lardas v. Grcic*, 847 F.3d 561, 571 (7th Cir. 2017) ("Christofalos asserts that he is entitled to intervene in his aunt's lawsuit because the bankruptcy trustee "abandoned" his claim against the Grcics. That assertion is simply wrong. As noted, the trustee sold Christofalos's claim, along with his interest in WSP and another lawsuit, to the Grcics."), reh'g denied (Mar. 15, 2017), cert. denied, 138 S. Ct. 164, 199 L. Ed. 2d 39 (2017).

[19]  *See, e.g.*, Companion case, Docket No. [#68-3] at p. 27 (The Bankruptcy Court: "And so we have at least a $3.2 million claim established by prior court order that the debtor had a full and fair opportunity to litigate, [but the debtor] *forfeited its right to pursue relief in the United States District*

purchased King Par's rights to defend this action withdrew all opposition to Izzo's post-trial motions, leaving them unopposed.[20]

Further, this Court has determined that Baird is King Par's alter ego. Indeed, the Court has indicated that under the applicable law, the alter-ego shareholder "stands in the shoes" of the corporation.[21]  Consequently, Baird cannot now be heard to complain that *his* interests are unprotected, since his interests and King Par's interests are the same.   Baird stands in the shoes of King Par and is therefore bound by the Bankruptcy Trustee's sale of King Par's right to defend this action. *See, e.g., Proctor v. Metro. Money Store Corp.*, No. RWT 07CV1957, 2011 WL 4368003, at *3 (D. Md. Sept. 15, 2011) ("Jackson and McCall both had the opportunity to litigate the restitution award amount but conceded that the proper restitution to be awarded was $16,880,884.86. Because MMS was the alter ego of Jackson and McCall, and because Jackson and McCall conceded that the proper amount of restitution was $16,880,884.86 in a prior adjudication, MMS is estopped in this action from contesting the amount of damages."). Accordingly, Baird's motion to intervene is denied.   For the same reasons, Baird's alternative motion for leave to file an amicus brief is denied.

The Court must now consider whether Izzo's unopposed post-trial motions should be granted.

_____

*Court by trying to avail itself of the benefits of Chapter 7 petition or proceeding in this court.*") (emphasis added).

[20]  *See*, Docket No. [#195] filed on August 8, 2017.   Baird filed his motion to intervene two days thereafter.

[21]  Companion Case, Docket No. [#59] at p. 24

<u>Motion for Enhanced Damages under 35 U.S.C. § 284</u>

Izzo maintains that this Court should award enhanced damages, as well as pre- and post-judgment interest, under 35 U.S.C. § 284 and Fed. R. Civ. P. 59(e).[22]

35 U.S.C. § 284, the relevant statute concerning damages for patent infringement, states that

> [u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court. When the damages are not found by a jury, the court shall assess them. *In either event the court may increase the damages up to three times the amount found or assessed.*

35 U.S.C.A. § 284 (West 2019) (emphasis added). Enhanced damages under this provision are to punish the infringer, not to compensate the plaintiff:

> Awards of enhanced damages under the Patent Act over the past 180 years establish that they are not to be meted out in a typical infringement case, but are instead designed as a "punitive" or "vindictive" sanction for egregious infringement behavior. The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate. District courts enjoy discretion in deciding whether to award enhanced damages, and in what amount. But through nearly two centuries of discretionary awards and review by appellate tribunals, the channel of discretion has narrowed, so that such damages are generally reserved for egregious cases of culpable behavior.

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932, 195 L. Ed. 2d 278

---

[22] The Court has already entered an initial judgment for the amount of the jury award. See, Docket No. [#177]. That judgment recognized that Izzo reserved the right to bring post-trial motions that would increase the amount of the judgment. *Id.* Izzo now seeks an amended judgment, adding the additional amounts being sought.

(2016) (citations omitted). An award of such enhanced damages may be appropriate where the infringer acted intentionally or knowingly, even if not recklessly. *See, id.*, 136 S.Ct. at 1933 ("The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless."). In sum, enhanced damages should not be awarded under 35 U.S.C. § 284 "in garden-variety cases," but should be reserved for "egregious cases of misconduct beyond typical infringement." *Id.* at 1935.

Whether to award such enhanced damages under 35 U.S.C. § 284, and how much to award, are matters left to the discretion of the district court, though such discretion must be exercised in light of the purposes and history of the statute and the particular circumstances of the case:

> Section 284 allows district courts to punish the full range of culpable behavior. Yet none of this is to say that enhanced damages must follow a finding of egregious misconduct. <u>As with any exercise of discretion, courts should continue to take into account the particular circumstances of each case in deciding whether to award damages, and in what amount.</u>

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. at 1933–34 (emphasis added).

In exercising its discretion in this regard, a district court may consider what are known as the "*Read* factors."[23] *See, WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 972 (Fed. Cir. 2018) ("Because a finding of willful infringement does not command the enhancement of damages, the *Read* factors, although not

---

[23] Referring to *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992).

mandatory, do assist the trial court in evaluating the degree of the infringer's culpability and in determining whether to exercise its discretion to award enhanced damages at all, and if so, by how much the damages should be increased.").

> The *Read* factors consider (1) whether the infringer deliberately copied the ideas of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) the closeness of the case; (6) the duration of the defendant's misconduct; (7) remedial action by the defendant; (8) the defendant's motivation for harm; and (9) whether the defendant attempted to conceal its misconduct.

*Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1245 n. 6 (Fed. Cir. 2017) (citation and internal quotation marks omitted).

A preponderance of the evidence standard applies to applications under 35 U.S.C. § 284. *Halo*, 136 S.Ct. at 1934 ("[P]atent infringement litigation has always been governed by a preponderance of the evidence standard. Enhanced damages are no exception.").

Here, the Court notes preliminarily that the jury's finding of willful infringement is supported by substantial evidence, and, indeed, by clear and convincing evidence. This predicate finding of willfulness permits the Court to exercise its discretion as discussed above. *See, Innovention Toys, LLC v. MGA Entm't, Inc.*, 667 F. App'x 992, 994 (Fed. Cir. 2016) ("[T]he predicate of willful misconduct is established by the jury's finding that MGA was subjectively willful under the second part of the *Seagate* standard. The jury made that finding under the clear-and-convincing-evidence standard, which is more demanding than

needed. *See Halo*, 136 S.Ct. at 1934. The Supreme Court in *Halo* did not question our precedents on jury determination of that issue. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1340–41 (Fed. Cir. 2016). Nor did it doubt that a finding favorable to the patentee on the second part of the *Seagate* standard suffices to establish the subjectively willful misconduct that, when present, moves the enhancement inquiry to the stage at which the district court exercises its discretion.").

In the exercise of its discretion, the Court has considered the *Read* factors and finds that they weigh in favor of imposing enhanced damages. With regard to the first and second factors, Izzo maintains that King Par, which had not previously sold dual-strap bags, copied the '704 patent and began selling infringing bags shortly after rejecting Izzo's offer concerning a license. Izzo further contends that in doing so, King Par did not have a good faith belief that its bags did not infringe Izzo's patent, since King Par ignored the advice of its patent attorney, both with regard to the design of the product and with regard to the necessity of having the attorney review the design. These arguments are supported by the evidence, and the Court therefore finds that these factors weigh in favor of enhanced damages.

With regard to the third and ninth *Read* factors, Izzo contends that during the course of this litigation, King Par engaged in misconduct and attempted to conceal the duration and extent of its infringement, by repeatedly failing to provide timely and accurate information about its sales of golf bags.[24] At trial, Baird

---

[24] *See, Lam, Inc. v. Johns-Manville Corp.*, 668 F.2d 462, 475 (10th Cir. 1982) ("Strictly speaking, although an infringer's resort to meritless defenses and dilatory tactics is not evidence of willful

acknowledged that King Par had repeatedly provided Izzo with verified information that was later shown to be incorrect, though he maintained that it was done unintentionally. However, Baird's explanations on this point are unconvincing given the size and complexity of King Par's business operations.[25] Accordingly, the Court finds that these factors strongly weigh in favor of enhanced damages.

The size and complexity of King Par's operations ("$70 million annual sales") would also typically weigh strongly in favor of enhanced damages under the fourth *Read* factor. Of course, the Court is aware, as discussed earlier, that Baird sold King Par's assets while this litigation was pending. Consequently, King Par is not *presently* a corporation with $70 million annual sales. Izzo maintains that Baird's decision to sell the corporation on the eve of trial (without any notice to the Court or opposing counsel) should not matter to the Court's analysis under this factor, since an infringing party should not be able to manipulate its financial circumstances in this way to avoid liability. The Court agrees and finds that this factor weighs in favor of an award of enhanced damages.

As for the fifth *Read* factor, Izzo contends that this is not a "close case," since King Par's attorney warned that an attempt to "design around" the Izzo patent would fail if the strap attachment points were axially spaced, and King Par

---

infringement, it suggests bad faith."). Additional details of King Par's litigation misconduct are detailed below under the Court's discussion of the application for attorneys' fees.

[25] According to Mr. Baird, "At one point, King Par was (by some measures) the eighth largest golf company in the world, and had annual sales that exceeded $80 million. At its peak, it had nearly 120 employees (and as many as 200 temporary employees, and had approximately 100 employees at the time of the asset sale." Baird Aff. [#27] at ¶ 13.

nevertheless went ahead and sold a bag with axially-spaced attachment points. The "closeness of the case" in this regard refers to the issue of whether the *infringement was willful or not*, see, *Read*, 970 F.2d at 827, and as already discussed the jury found that infringement was willful under the rigorous pre-*Halo Seagate* standard, thereby indicating that this was *not* a close case. Accordingly, this factor also weighs in favor of imposing enhanced damages.

With regard to the sixth and seventh *Read* factors, the "duration of the defendant's misconduct" and "remedial action by the defendant," Izzo maintains that King Par sold infringing bags beginning in 1997 and continued until three years after this litigation was commenced. King Par attempted to show otherwise, but as previously discussed the jury clearly rejected King Par's assertion that it sold the infringing bags for less than two years, and that it immediately stopped selling the bags after being contacted by Izzo in early 2002. Consequently, these factors weigh in favor of assessing enhanced damages.

Finally, with regard to the eighth *Read* factor, "the defendant's motivation for harm," Izzo's position is unclear, since its motion indicates both that this factor is "neutral"[26] and that it "weighs in favor of enhancement."[27] Izzo contends, though, that King Par's motivation was "to maintain a competitive presence in the market for golf bags, which was shifting toward dual-strap designs."[28] Based on this factual assertion, the Court finds that this factor is neutral, since King Par was

---

[26] Docket No. [#182-13] at pp. 9 & 16.
[27] Docket No. [#182-13] at p. 15.
[28] Docket No. [#182-13] at p. 15.

not acting out of a desire to harm Izzo.

Having considered and weighed all of these factors, the Court finds in its discretion that an award of enhanced damages is warranted. Specifically, the Court finds that an award of treble damages, or $9,859,429.95, is appropriate, particularly in light of King Par's lack of candor with regard to the duration and extent of the infringement.

<u>Motion for Attorney Fees and Expenses under 35 U.S.C. § 285</u>

Izzo maintains that it is entitled to attorney fees and expenses, because King Par's willful infringement and litigation misconduct make this an "exceptional case." Izzo's argument is summarized in its papers as follows:

> Here, King Par received an opinion of counsel in September 1997 advising it either to take a license to the Izzo patent, or change the design of the product it was marketing as it would infringe the claims of Izzo's patent. King Par did neither, and when asked at trial whether he thus knew that every bag King Par thereafter sold would be infringing, Mr. Baird responded "yes."[29] The evidence (sales presentations and product catalogs) also revealed that King Par continued to sell infringing bags for at least three years after this lawsuit was commenced in 2002. Given these remarkable facts, an award of attorneys' fees is both appropriate and necessary.
>
> An award of attorneys' fees is further justified by King Par's conduct during the litigation, which caused increased expense and delay. King Par, on the eve of the damages trial, and over six years after the close of discovery, produced an opinion of counsel on infringement issues that it had obtained in September 1997 and which, for reasons that remain unexplained, was never previously disclosed.

---

[29] Baird added that he was advised by his attorney that the strap attachment points on the infringing bags were "not aligned along the axis," and therefore did not infringe. However, this Court has already found that the strap attachment points on the infringing bags (the "old style" bags) were aligned along an axis. *See,* Decision and Order [#107] at pp. 34-36.

17

During discovery, King Par also repeatedly delayed disclosing financial records or even sales figures, regarding the sale of infringing units, forcing Izzo to seek court intervention at least twice – and even then the data produced by King Par regarding the universe of potentially infringing bags was incomplete (and inconsistent) to the point that it suggests King Par willfully attempted to frustrate Izzo's efforts to discern the true extent of the defendant's infringing conduct. King Par also repeatedly refused to verify the limited sales information it finally did provide, even though it was obligated to do so. Moreover, at trial King Par sought to contradict its previously certified sales figures with newly minted calculations which, predictably, purported to show that the number of infringing units was materially less than those previously disclosed.

Furthermore, requiring Izzo to bear the litigation expense of enforcing its patent rights means that the consequences to the defendant for its willful and intentional conduct are no different than if its infringement was inadvertent – a concept that is counterintuitive and which cannot be the result intended by the law. Attorneys' fees are not punitive, but rather are compensation to the prevailing party for the cost of the suit and are properly awarded here.

Docket No. [#176-19] at pp. 15-16 (citations omitted).

35 U.S.C. § 285 states that in a patent-infringement action, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." As the term is used in this statute,

an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554, 134 S. Ct.

1749, 1756, 188 L. Ed. 2d 816 (2014). Under this standard, "a case presenting *either* subjective bad faith *or* exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.*, 134 S. Ct. at 1757 (emphasis added). "Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less such a high one." *Id.*, 134 S. Ct. at 1758. In considering the totality of the circumstances,

> district courts could consider a "nonexclusive" list of "factors," including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."

*Id.*, 134 S. Ct. at 1756 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, 114 S.Ct. 1023, n. 19 (1994)).

Having considered the legal principles set forth above, as well as the facts set forth above and in Izzo's papers, the Court finds that this is an exceptional case within the meaning of 35 U.S.C. § 285, based on King Par's will infringement and its conduct during the litigation of this action. An award of attorney fees and expenses is warranted. Further, the Court finds that the amounts requested by Izzo are fair and reasonable. Accordingly, Izzo's motion [#176] is granted in its entirety, and Izzo is awarded fees and expenses under 35 U.S.C. § 285 in the amount of $441,835.99.[30]

Pre-judgment Interest

---

[30] *See, e.g.*, Yesawich Affidavit, Docket No. [#176-2] at ¶ 5 ("The total amount requested for attorneys' fees provided by Harris Beach through May 31, 2010 is $394,690.41, plus $47,145.58 for reimbursement of expenses, for a total of $441,835.99.")

Izzo seeks an award of prejudgment interest pursuant to 35 U.S.C. § 284. In particular, Izzo requests pre-judgment interest on both "royalty damages" and "attorneys' fees."[31]   With regard to the "royalty damages" (the damages found by the jury), Izzo requests $1,751,101.14 in pre-judgment interest, based upon the yearly weighted average of Izzo's actual borrowing rates during the period September 18, 2001 through July 8, 2010, compounded annually.[32]   Alternatively, using the prime rate, Izzo calculates that prejudgment interest on the jury award is $1,530,704.19.

In patent cases, "prejudgment interest should ordinarily be awarded where necessary to afford the plaintiff full compensation for the infringement." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654, 103 S. Ct. 2058, 2062, 76 L. Ed. 2d 211 (1983).   Such interest applies to compensatory damages,[33]   though courts may also award pre-judgment interest on attorney fee awards.[34]   The Court has discretion concerning the interest rate and may select "the actual rate paid by the patentee during the relevant time period." Robert S. Frank, Jr. & Denise W. DeFranco, *Patent Infringement Damages: A Brief Summary*, 10 Fed. Circuit B.J.

---

[31] Docket No. [#182-13] at p. 20, n. 14.

[32] Docket No. [#182-13] at p. 21, Docket No. [#182-5]. In this regard, the jury found that King Par's infringement lasted from 2000 through 2005, but Izzo did not have any outstanding loans prior to September 18, 2001. Docket No. [#182-5] at ¶ 6.

[33] Izzo also makes a cursory request for pre-judgment interest on enhanced damages, Docket No. [#182-13] at p. 22, but "prejudgment interest cannot be assessed on the increased or punitive portion of the damage award." *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir. 1983).

[34] *See*, § 33:37.50 Prejudgment interest on attorney fee award, 5 Annotated Patent Digest § 33:37.50 ("In cases where a patent litigant has undertaken acts in "bad faith or other exceptional circumstances" a district court has discretion to award prejudgment interest on the attorneys fees awarded in a case.") (collecting cases).

281, 296 (2000) (citing *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066, 219 U.S.P.Q. 670, 676 (Fed. Cir. 1983)).

As mentioned earlier, Izzo requests pre-judgment interest, on the jury's award of reasonable royalty damages, in the amount of $1,751,101.14. Such an award is necessary to fully compensate Izzo, and the Court accordingly grants that request. Izzo also makes a cursory reference to a similar award of pre-judgment interest "on any attorneys' fees awarded," but, unlike the request for pre-judgment interest on compensatory damages, does not request a particular amount or propose how such an award would be calculated.[35] Consequently, the request for pre-judgment interest on the attorneys' fee award is denied.

Post-judgment Interest

Finally, Izzo indicates that it is entitled to post-judgment interest pursuant to 35 U.S.C. § 284 and 28 U.S.C. § 1961(a) on the "total award, including the compensatory damages found by the jury, attorney's fees and expenses, enhanced damages and pre-judgment interest," "at the statutory rate."[36] The Court agrees, and accordingly the entire amount of the amended judgment will be subject to interest as provided in 28 U.S.C. § 1961.

CONCLUSION

Baird's motion to intervene [#196] is denied. Izzo's post-trial motion [#182] for enhanced damages and interest is granted.[37] Specifically, in addition to the

---

[35] Docket No. [#182-13] at p. 20, n. 14.
[36] Docket No. [#182-13] at p. 21.
[37] Except insofar as it requests pre-judgment interest on an award of attorney fees, as discussed earlier.

prior jury award in the amount of $3,286,476.65 for which judgment has already been entered [#177], Izzo is awarded enhanced damages in the amount of $6,572,953.30, and pre-judgment interest on compensatory damages in the amount of $1,751,101.14. Izzo's post-trial motion for attorneys' fees and expenses [#176] is granted in the amount of $441,835.99. Post-judgment interest on the entire amended judgment amount ($12,052,367.08) shall be allowed as provided for in 28 U.S.C. § 1961.[38]

       SO ORDERED.

Dated:       Rochester, New York
              August 26, 2019

                                ENTER:

                                /s/ Charles J. Siragusa
                                CHARLES J. SIRAGUSA
                                United States District Judge

---

[38] As noted, Izzo has already received a portion of this amount. 28 U.S.C. § 1961(b) provides for interest between the date of the judgment and the "date of payment."